1, 2, 3, 1, 3, 2, 1, 3, 3, 2, 1, 2, LFP IP LLC, et al. v. Hustler Cincinnati Incorporated, et al. Artisans not to exceed 15 minutes per side. Mr. Hynoski for appellant. May it please the court, Robert Hynoski on behalf of appellants Hustler Cincinnati Inc. and Jimmy Flint. And I would reserve three minutes for rebuttal. Okay. Your honors, this consolidated appeal arises from a series of decisions made by the district court, not from any decision made by any jury. This case arises from a unique 40-year business relationship between two brothers who have varying personalities and have had a unique journey, to put it mildly. A lot has happened over the years and there certainly have been ups and downs. As Larry Flint indicated many times, but as the record reflects in this case in 2002, Jimmy was always there from the beginning. He was a loyal brother. He made innumerable contributions. And Hustler, as it is today, would not exist without him. We respectfully submit that the district court in this case erred in a number of ways. The court failed to recognize in any way my client Jimmy Flint's life's work. His 40-plus year business relationship with his brother and contributions to a family business that started from a singular bar and grew into an international multimedia conglomerate. The district court we would submit failed to consider the totality of the circumstances of these brothers' relationship. The district court, although labeling the case initially as one in equity, and certainly there are multiple components to this case that are based in equity, failed at any point in time to consider any equity maxims. In fact, in several of the court's written summary judgment decisions, the district court specifically said that it really wasn't concerned with notions of fairness and whether or not Larry Flint did right or not to his brother. Well, there's no, if one is considering equitable principles, one has to be considering claims or defenses where it's appropriate to take those into account, doesn't one? I would agree with that. And many of the claims in this case don't appropriately call for the invocation of equitable principles, do they? Well, I think that's a multifaceted question. For example, what about the issue of whether, just the legal question of whether Jimmy was in partnership with his brother? I mean, that's a legal issue, isn't it? I would submit to you that the determination of a partnership is a mixed question of law and fact, and it, in fact, is one that is often made up. Well, I don't mean by saying it's a legal issue. I didn't mean legal as opposed to not mixed issue of law and fact. I meant just as opposed to an issue that's equitably determined as opposed to based on legal principles. And I would agree with you. The existence of a partnership is legal, and I would submit it's a mixed question. The remedy afforded from a partnership is an accounting, which is generally considered to be an equitable remedy. But in this particular case, our client was denied a right to a jury determination as to whether or not there was a partnership. The court considered it to be an equitable issue and, therefore, indicated that it would proceed on a non-jury basis. That was the beginning. We had a four-day bench trial on the bifurcated issue of whether there was a partnership or not. And then, subsequently, there were a series of summary judgment decisions that were based on the record evidence at that time. Claims of unjust enrichment, sound inequity. And I would submit to you that disputes related to family business enterprises have certainly equitable components for them. The existence of a partnership under the Uniform and Revised Uniform Partnership Act indicates that equity shall supplement the rules of law that exist regarding the formation of a partnership. You're arguing the case at a pretty high level of generality. Equity, fairness, brothers. There's an awful lot of testimony from their prior disputes. There are releases that don't make any sense with the notion that there was a partnership with these folks after the releases. So can you argue it at a slightly lower level of generality? Sure. And I will say that to understand this case from our perspective and to understand really the issues and all claims and defenses that are asserted, we would submit one has to start in the beginning. I don't think that's going to help me. Don't do all claims. Do one. How about partnership? What's wrong with the partnership decision given the testimony, given the many times Jimmy said in the past it was not a partnership, given the fact that the district court judge thought the times he said the opposite, it was incredible. So how do you deal with that? Certainly. The evidence showed that this family business, that this relationship with these brothers started in 1969. Yet the district court's analysis began in 1978 and largely ignored the first eight, nine years of this relationship where we would submit. Didn't those initial periods end with releases and things that are inconsistent with a partnership? It did not. In 1978, three months after Larry Flint was shot by an unknown person at the time, he was shot in March of 1978. Up until that point in time, we would submit the evidence as uncontroverted of ownership, partnership, co-association of these brothers for purposes of carrying on a business. There was an entity that was created that was a mail order company that was formed to sell products across state lines that never made any money. The record was clear on that. It was being investigated by the federal authorities for mail fraud allegations. And this was a time, three months after Larry Flint was shot, when an agreement was at least submitted and tendered, which Your Honor I think is referring to, in June of 1978. It's a four-page document. It is ambiguous on multiple levels. Larry Flint was asked at the partnership trial what that document was, what it intended to do. He said, I don't know. I didn't have any agreement with my brother. There was no testimony from Larry Flint at trial that there was a release or settlement of any business activities or assets with his brother at that point in time. There was no testimony from anybody that, in fact, there was a release. We submitted testimony from individuals that knew these brothers forever. James Bays, Mr. Shapiro, Bernice Flint, and others. The company attorney for many of the years, Alan Eisenman, who argued the infamous Jerry Falwell case, each of them were asked, was there ever a release, settlement, agreement, buyout between these two brothers that you're aware of? And not one witness said that there was. Larry Flint didn't say that there was at the time of the partnership trial or at any point in time. The agreement says no one knows who drafted it, no lawyer drafted it, no independent legal advice. This was allegedly signed at a time when Larry Flint was in intensive care addicted to narcotic pain medication by his own testimony. If no one can tell us what they meant by it, maybe we should just read it. I think that any contract, you need to start with the plain language, and if it's clear, then it's clear. But I would submit to you that even during the partnership trial, Judge Berlesman indicated that the document was ambiguous. He specifically inquired with Larry Flint, who was on the stand at the time, what the intent was. He could not articulate any intent to it whatsoever. And when it's ambiguous, you have to look to the intent of the parties. And here, there's no expressed intent from the parties that this was designed to settle their business dispute. Our client, in fact, testified that at this time, after Larry was shot, he and his wife and the publishing operations were going to move to Los Angeles. Our client was living in Columbus and had two young boys, intended to raise his family in Kentucky. And the testimony was that we were going to create a document at the advice of counsel to separate out this mail order company because we knew it was headed into bankruptcy, and in fact, that's exactly what happened a year later. Never made a profit in any way, shape, or form. Ultimately, operations were transitioned to California, and according to Larry's position, essentially he started putting things in his name, at least that's what the district court found. There's no real evidence as to any of that. Furthermore, that document indicates that one of the expressed intents was to resolve disputes about ownership of LFP. But the document doesn't say who owns LFP. Well, but your client in his divorce case in 2003 said he didn't own LFP, correct? Well, I don't think he was pressed that specifically on LFP. My client certainly gave a deposition in 2003. The import of it was he didn't own any, he didn't have any ownership interest, correct? That he didn't have legal title. Was it the partnership listed as an asset? It was not. They never got divorced. I know, but they were in proceedings. They were in proceedings. The discovery was just beginning. The testimony from Mrs. Flint and the record evidence, my client, was that Mrs. Flint's attorney was ready to go to California, and she was in the process of looking for assets and doing that process. And the testimony, which Larry does not deny, is that he and Jimmy talked, and they decided to resolve that proceeding. And money was taken out of the company to pay support to Bernice Flint, which has continued, even though now, of course, it's just my client that has paid it, and that they never got divorced. And the testimony overwhelming. I'm sorry. No, that's okay. So, I mean, basically he testifies in 2003 he didn't have an interest. He's never on his tax returns ever indicated any partnership income of any kind, right? So basically what he's been telling the IRS is he's had no partnership income. This enterprise, like many, I would submit. That's correct, right? That is correct. Although for many years he issued K-1s in the early days, all of his tax returns flow through his income from the formative years of the relationship, when Hustler Magazine was started, when all the clubs were in place. It was all through my client's return. And I would submit to you that the case law reflects, and this court can find, that business enterprises are unique entities. Family business enterprises are particularly unique. The concept of a close corporation was formed initially in 1975 from a Massachusetts court and has been universally- I didn't understand this. One thing you just said. You're saying initially through these K-1s all of the business tax returns were done through your client? Everything. Correct. And we've submitted that. So then why did it change? I mean, given how you responded to Judge Kethledge's question, when did that change? It began to change when operations transitioned out to California. My client stayed behind in Kentucky with his family. Isn't that particularly problematic that there was a time where all of this alleged asset we're fighting about was on your client's tax return and suddenly that switches entirely and that also happens to be consistent with other things that were done? But I would submit to you that the essence of a partnership and of a close corporation is that title can be in one person's name. There's a decision, an implied partnership decision, that I think is very thoughtful from your home state, Judge Gibbons, Montgomery v. Montgomery out of Tennessee, and it was a discussion of a man and woman that lived together for 30 years and they started a business and it grew to other businesses and grew to other businesses, and at the time that they ultimately separated their ways, they were never legally married, there was a dispute over who owned what and what was what. And the man said, well, it's all in my name at this point in time. And ultimately the decision was that doesn't matter. Just like in a divorce proceeding, it doesn't matter. Everything was in my client's name for the first eight or nine years of this business. Does that mean that Larry had no interest in any of that? I don't think my client has ever suggested that. If you've concluded that thought, I think you'll have your rebuttal time. Thank you. Good afternoon. I think we must be talking about two separate records that are before the court, one that we've briefed thoroughly in our papers and one which Mr. Hanosky is trying to refer to now. To say this is a family business and that Jimmy was, quote, always there is frankly false, and it's clear from the outset that Jimmy was basically subservient and employed by Larry Flint for his entire career. Indeed, by the time he was terminated from his employment in 2009, that made the third time during the course of their relationship that Jimmy Flint had been terminated from employment. Well, that kind of cuts both ways, doesn't it? I mean, he keeps bringing him back. Why? Why? Why? It's his brother. His brother gave him the $5,000 to start. That supports him a little bit, right? I don't think it does from a legal basis whatsoever. One thing that Judge Bertelsman made clear is that at least from 1976 forward, there was no, no mistake whatsoever about who owned what. The reality is that the original release in 78 basically gave Jimmy Flint a business to run in exchange for a full release from everything else. It was clear at that point that Larry Flint was taking what really was his entire operation and moving to California with it. Indeed, not long after that, at a time after Mr. Flint's problems escalated and there was a need for a conservatorship, Jimmy Flint applied for the conservatorship and said very clearly that he had no ownership interest in any of the businesses. I mean, that was an affirmative statement made not because he was being challenged but because he was saying that. Once the conservatorship ended, there ensued litigation in California that went on for several years over the question as to whether Jimmy Flint, during that conservatorship, basically embezzled money out of the business. That ended, finally, with yet another release, the one that Judge Bertelsman described as the broadest release that you can have, releasing any claims that Jimmy Flint had to anything. Now, Larry Flint did bring him back as an employee, paid him well, but there was no partnership created, never was. I think the evidence was absolutely clear. There is corporate document after corporate document after corporate document showing the ownership interest in LFP and in all the business that flows. What happens if you win and the Judge Bertelsman orders are affirmed? So, going forward, that means what? That Jimmy's allowed to continue to run the retail stores only if he pays these licensee fees or does it mean that if Judge Bertelsman's affirmed, those retail stores shut down and that's the end of it? No, there is one retail store. Actually, now, Jimmy Flint has expanded to two additional locations that is owned 100% by Jimmy Flint. It is not part, it is not. I get that, but are they effectively shut down by this decision or does he just pay licensing fees and then it marches on? No. He has to change out the market. He would have to get a new license. The license fees, he chose not to pay them, so they were terminated. Okay. The license was terminated. So that means? He can continue to, he is, in fact, running stores without the benefit of using hustler trademarks. I see. I see. So they've already gone down that road. I got it. Yes, and they've been down that road for two years. The injunction gave him a certain period of time within which to stop using the hustler name and mark and they went ahead and complied, Jimmy went ahead and complied with that injunction? With hustler, there is an outstanding issue involving his usage of the name Flint without an identifier to identify him as Jimmy Flint as opposed to Flint, which does have connotations that we say are. And the issue outstanding where? Well, a couple places, both in the southern district and now also in Florida. I think it's the middle district. I have to get my district straight in Florida, where he has opened another store. Okay. So an affirmance won't end this? It will end most everything except for a couple disputes just involving his usage of certain names, not hustler per se, but Flint. Is there some question about the conduct to which the injunction extends? Well, the issue, at least raised briefly in their papers, says that, well, wait a minute, the judge expanded this too far to include all of the trademarks owned by. Well, it's without question, though, that this particular litigation, that the scope of it was limited to hustler and then there was one other name, Hollywood something. I can't remember what the other name is. Relax, it's just sex was one of the ones. Yeah, that's mentioned in the order. Actually, there is a portfolio, very colorfully named, of trademarks that are owned by LFPIP. Hustler Hollywood. Yes. Okay. LFPIP does own a large array of trademarks. Can I ask you just how you would procedurally characterize what the district court was doing when it had this hearing that resulted in no partnership finding? Yes. The court said, we have to back up because initially Jimmy Flint brought an action in the state court here in Hamilton County, Ohio. Well, he requested a jury trial, right? Wrong. Originally, he did. Judge Bertelsman made clear in a pretrial conference, he said, look, I've got plenty of time on my hands. If you want to do this as a bench trial, and this is on the record and we cite it in our brief, I can do that. He said he felt most of it would be equitable because of the nature of the claims and asked both parties to consult with their clients and advise him whether or not that would be appropriate. He said, if we do that, I can get us to trial probably within the next 90 days. Mr. Anosky was very quick to say, yes, we want a trial and we want to go before you. So any request for a jury was waived and the court was correct to arrange the trial in any way that he saw fit and there was never, never a question about a jury until this appellate brief. And so it was appropriate for the court to do an evidentiary hearing on one issue and then basically resolve the rest of the case on motion. Correct. And that's an accurate way to describe what happened. Yes, I believe it is. I think most people felt, at least we certainly did, and I think all counsel did at one point, that if, depending on the resolution of the partnership issue, that should have decided really the rest of it because so much was based upon the contention that there was a partnership. Mr. Flint thereafter raised other types of issues. I would submit that even the employment case was almost like not pleading in the alternative but basically having an ability to actually proceed in the alternative after he had already been found not to be a partner and during the course of that trial had testified clearly that he was not an employee. He scoffed at the notion that he was an employee. So I think from all of the evidence that we have of record, and particularly the testimonial record, it's clear that there was no partnership. If one looks at Jimmy Flint's 2003 deposition, in particular in the divorce proceedings, it baffles me how one can present a position different from that just a few years later. It couldn't have been clearer what he said at that stage in terms of what Hustler was. Hustler was Larry Flint. He basically said all he does is work for his brother and he's employed to go around and find locations. That was, in fact, accurate. Yet at the trial before Judge Bertelsman, he tried to basically say that he was not telling the truth at that time. Because he's less than truthful, right? And as Judge Bertelsman observed, it's one of the first times he's ever had counsel come before him and really ask that he find that his client had committed perjury. But we submit that the untruthfulness was in trying to walk away from that testimony. And when one even looks at Jimmy Flint's testimony in the trial before Judge Bertelsman, even being examined by his own counsel, he had trouble even trying to articulate the notion that they were partners. He said, well, we were brothers. Brothers first, he said. Well, true. But Jimmy Flint, he was my brother. I employed him and I paid him. I have nothing further unless you have further questions. I don't think we have anything further. Mr. Harginowski. The court resolved several cases on summary judgment after the bifurcated trial where there were multiple disputed material questions of fact. Judge Kethledge, you recently sat on a panel that decided the Lemon v. Ayers case in March of this year related to a woman who had a business relationship with a business owner. He made promises to her of future ownership of the Subway store. She worked kind of based on that promise, and then he ultimately tried to break that promise and summary judgment was granted. A suit was filed and summary judgment was granted in favor of the business owner. And this panel, Procurium, indicated that promises of future ownership and dangling essentially assets in front of one's nose to get them to take certain action or take less money are actionable. And that case was reversed and remanded. And there was a bulk of testimony in this case and admissions by Larry Flint that he has made numerous promises to his brothers over the years, including the past 10 or 15 years, in the 2000s particularly, related to Jimmy's ownership stake in the company, to continued compensation to get him to act, to get him to transfer and divest assets. Larry believed that he could take assets from Jimmy and that Jimmy essentially had no choice in the matter, including the Hussler store in Monroe, Ohio, that today, to date, remains the most profitable Hussler store that there is. Jimmy owned that store for multiple years. He took salary out of that store and in 2005 was induced to convey it to his brother for nothing, for zero, and to then transition his employment, only to be essentially kicked out four years later from this family business that he helped create. And speaking of the divorce issue, because I know that it was relied upon extensively by the district court, Larry Flint is currently married to his fifth wife, but was divorced from his third wife in the early 1970s when this family business was started. He went to Montgomery County Court where that proceeding was and said that, I don't own anything. This was 1972, 1973, several years into their business relationship. At times when there have been criminal prosecutions, Larry says, I don't own anything. It's structured differently. And so this notion of protection of family business assets and partnership assets is not uncommon in a family. It's not uncommon in a partnership. And that is what has happened over the years. Larry Flint believed that his assets were in part in Jimmy's name when Jimmy was going through divorce proceedings. So Larry tells his brother to distance yourself from those, which is what occurred. The district court ruled that Larry was always, no matter what the documents showed, always the true owner. And I would submit to you that that finding is contrary to well-established Ohio law and against public policy, that Larry was not the true owner from the beginning. And it raises the question, well, how did he become the owner? He admits he never paid for anything. He admits he never bought his brother out. Your time is up if there are no more questions. We appreciate the argument that both of you have given and will consider the case carefully.  Thank you.